IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANTHONY NEWMAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 08 C 7456 |
| ) | |
| DAWN CIKULIN, MICHAEL CLEMONS, ) | |
| DARRELL REUM, MARSHALL MASON, ) | |
| PAUL NAUDEN, JOSE RAMIREZ, ) | |
| and CITY OF CHICAGO, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Plaintiff Anthony Newman has sued Chicago police officers Dawn Cikulin, Michael Clemons, Darrell Reum, Marshall Mason, Paul Nauden, and Sgt. Jose Ramirez, asserting claims of false arrest and unlawful detention, malicious prosecution, conspiracy, unlawful seizure of property, and indemnification of the officers by their employer, the City of Chicago. The defendants moved for summary judgment on all five claims but later withdrew the motion as to Counts 4 and 5, the claims involving unlawful seizure of property and indemnification. For the reasons stated below, the Court grants summary judgment for the defendants on Counts 1, 2, and 3.

### Facts

The following facts are undisputed. Newman was arrested January 2, 2007 at 6743 South Dorchester Avenue in Chicago and charged with delivery of a controlled substance. On November 17, 2006, Clemons, Cikulin, Nauden, and Ramirez took part

in an ongoing undercover narcotics operation called "Operation 3-Peat." The operation was initiated in September 2006 to combat drug and gang activity around the 6700 block of South Blackstone Avenue; it concluded in January 2007. By November, 2006, police had identified 10 to 14 potential drug dealers. On November 8, 2006, police spotted Newman, who had been given a sentence of probation for selling drugs in the area in 1999 or 2000, talking to Ford, just before a narcotics transaction took place between Ford and undercover Officer Tonita Jones.

On November 17, Clemons and another officer, Jones, posed as undercover narcotics buyers, while Cikulin drove an undercover surveillance vehicle and Nauden videotaped. At about 11:25 a.m. at 6608 South Blackstone Avenue, Clemons and Jones purchased two grams of crack cocaine from Samuel Ford, a target of their investigation. After purchasing the crack, Clemons and Jones asked Ford to sell them an "eight-ball" of crack, an eighth of an ounce. They agreed on a price of $120, but Ford said he would have to make a phone call to get the eight ball because he did not have that much cocaine on him. Ford told the officers to return in fifteen minutes. Officers conducting surveillance observed Ford walk into a residence at 1446 East 66th Place. Newman contends that Ford remained there for about nine minutes; the defendants say it was unclear how long he was there. Police saw Ford again at 11:35 a.m., talking to an unknown individual.

Records of the police video surveillance reflect what happened next. For approximately the next twenty minutes, Ford talked on his mobile phone and interacted with people on the street. At 11:41 a.m., surveillance officers saw Ford talking to the occupants of a brown Chevrolet Tahoe at the corner of 67th Street and Dorchester

Avenue.  At 11:48 a.m., officers saw Ford shake hands with another person in the 1400 block of West 66th Place.  At 11:49 a.m., he was seen talking on his mobile phone while walking north on Blackstone Avenue.  He was seen again speaking on his phone while talking to another person at 11:51 a.m., before handing an unknown item to different person and then talking to two more people and handing another unknown item to one of them.

The basic facts involving the second transaction between Ford, Clemons and Jones are also undisputed.  At about 11:55 a.m., the same Chevrolet Tahoe the police had seen earlier arrived at 66th Place and Blackstone Avenue, and Ford got inside.  A few minutes later, the Tahoe arrived at 6608 South Blackstone Avenue.  Ford got out of the Tahoe and sold the additional crack to the officers, who were sitting inside an undercover vehicle.  Ford got back into the Tahoe, which then drove away.  During the transaction, the Tahoe and the vehicle being used by the undercover officers were about ten feet away from each other.  Clemons testified that Newman watched the transaction take place.  Newman has not admitted he watched the transaction, but he concedes that during the second narcotics transaction, Clemons had a good view of him.

Though it is not entirely clear from the record whether Newman has admitted to being the driver of the Tahoe each time police saw Ford in contact with the occupants of the Tahoe that morning, there is no question Newman drove Ford to the location where Ford conducted the second narcotics transaction with the police.  Newman's relative Cedric Tucker was in the front passenger seat, and Ford was in the back.  After the Tahoe drove away from the location of the transaction, Ford got out less than a block

from where the transaction had taken place.  Sergeants Ramirez and Charles Artz stopped the Tahoe to identify the occupants.  Because the investigation was still ongoing, Artz and Ramirez did not arrest either Newman or Tucker.

Newman says he did not know Ford was selling drugs on November 17, though he did know Ford had spent time in jail.  Newman said he was driving in the area; he saw Ford at 66th Place and Blackstone Avenue, and Ford asked him for a ride. Newman says that after he picked up Ford, Ford went to a store on 67th Street, and Newman then dropped him off at 64th Street and King Drive.  Newman testified in his deposition that Ford did not call him to ask him to pick him up.  He also said there was no discussion of drugs or cocaine while Ford was in his car.  Newman said that when he was pulled over, one of the officers told Newman he liked his car and was considering getting the same type.  Ramirez denies saying that.

Nauden, who worked as a surveillance officer on November 17, testified during his deposition that he believed the Tahoe was necessary to the drug deal because Ford did not engage in the second transaction until after he returned in the Tahoe.  Nauden said he believed it was unlikely Ford obtained the cocaine while in the residence at 1446 East 66th Place or while talking to others on the street.

Both Ford and Newman were arrested about six weeks later, on January 2, 2007 for delivery of a controlled substance.  Tucker was not arrested.  November 17 was one of four dates on which police alleged Ford had provided them with crack cocaine.  By January 31, six other individuals had been arrested and charged with delivery of a controlled substance.  Police also impounded the Tahoe, which was registered to Newman's mother, Sandra Neely.  Ford and Newman were later indicted on a charge of

delivery of a controlled substance within 1000 feet of an elementary school. Newman was ultimately found not guilty.

Despite the number of phone calls police saw Ford make before engaging in the second narcotics sale with undercover officers on November 17 and the fact that Ford told Clemons and Jones he had to make a call to get more crack, Clemons said he did not know if police checked Ford's phone records to see whom he called that day.

On January 19, 2007, Cikulin testified before a grand jury considering whether to indict Newman. Cikulin testified that Ford had stated he obtained from Newman the crack he sold to Clemens and that this statement by Ford was recorded. This testimony appears to be false. Clemons has stated that he was unaware of any such information. and there is no evidence of a recorded statement by Ford along these lines.

Newman says when he was arrested, he had $1,500 in cash. He says that Nauden inventoried $750 of the money and kept the rest. The defendants deny Newman's contention. Newman also accuses the defendants of taking part in a conspiracy to falsely arrest him and institute criminal charges against him and to generate false police reports to cover up their misconduct and support the false arrest and charges.

Newman says that at one point, Ramirez and other officers threatened him to get him to provide information about Ford. Specifically, Newman says, Ramirez told him the police would confiscate his Tahoe. Ramirez denies saying that. Newman also says that Nauden and Ramirez told him he was "going down" if he did not provide information about Ford. The defendants deny that allegation as well.

Newman hired attorney Sam Adam Jr. to defend him on the criminal charges and

paid Adam $5,000. Newman also paid $3,000 to retrieve the Tahoe and another $3,000 to post bail. As indicated earlier, he was acquitted of all criminal charges.

## Discussion

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A court may not grant summary judgment if a reasonable jury could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). When considering a motion for summary judgment, the court should accept as true the nonmoving party's evidence and draw "all justifiable inferences" in favor of the that party. *Id.* at 255.

**1. False arrest / unlawful imprisonment claim**

Newman's first claim is that he was falsely arrested and unlawfully detained in violation of his rights under the Fourth Amendment. To succeed on this claim, Newman must show that he was arrested without probable cause. *Brooks v. City of Chicago*, 564 F.3d 830, 832 (7th Cir. 2009). Probable cause exists when the facts and circumstances known to the arresting officer would lead a prudent person to believe a person had committed or was committing an offense. *See, e.g., United States v. Mounts*, 248 F.3d 712, 715 (7th Cir. 2001). Probable cause does not require evidence sufficient to convict, but there must be a "probability or substantial chance of criminal activity . . . ." *Id.*

Mere physical proximity to a crime does not establish probable cause. For example, the Seventh Circuit held that probable cause did not exist in a case in which

the police saw a person carry a bag down a gangway leading to the home of a known narcotics trafficker who was the subject of an investigation. *United States v. Ingrao*, 897 F.2d 860, 863 (7th Cir. 1990). Mere association with a person committing an offense is likewise insufficient. *Id*. at 864. As the Seventh Circuit stated in *Ingrao*, "[i]n order to find probable cause based on association with persons engaging in criminal activity, some additional circumstances from which it is reasonable to infer participation in criminal enterprise must be shown." *Id.* (quoting *United States v. Hillison,* 733 F.2d 692, 697 (9th Cir. 1984)).

The Supreme Court has, however, treated common ridership in a car differently. "[A] car passenger . . . will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing." *Wyoming v. Houghton*, 526 U.S. 295, 304-05 (1999). *See also, Maryland v. Pringle*, 540 U.S. 366, 373 (2003). People traveling in the same car together do so "by choice, not by chance – or at least a reasonable officer could" so believe. *Ahmed v. City of Chicago*, No. 08 C 6909, 2010 WL 1193873, at *3 (N.D. Ill. Mar. 18, 2010). In *People v. Ortiz*, the Illinois Appellate Court held that police had probable cause to arrest a person riding in a truck traveling closely behind a car that police believed to be part of a drug transaction. *People v. Ortiz*, 355 Ill. App. 3d 1056, 823 N.E.2d 1171 (2005). According to the court in *Ortiz*, "*Pringle* teaches that the choice of co-occupants of a vehicle to travel together in close proximity constitutes the 'more' in the familiar holding that 'a person's propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause . . . .'" *Id*. at 1073, 823 N.E.2d at 1184-85 (citing *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)).

7

Newman was not merely in Ford's presence during the narcotics transaction. Rather, Newman drove Ford to the spot where the transaction took place and waited for him while drugs and money were being exchanged, only feet from Ford and the undercover officers. Newman argues that there is an issue of fact to whether his brief interaction with Ford gave rise to probable cause. But from the perspective of a reasonable officer, there was a reasonable basis to believe that Newman was involved in the drug deal. Two undercover officers asked a person they knew was dealing drugs to sell them cocaine. The dealer told them he had to make a call and would meet them in fifteen minutes. Other officers saw the dealer talking on his phone, and a short time later a vehicle pulled up. The dealer got into the vehicle, left, and then returned within the allotted time in the same vehicle. The drug deal then took place. Though it is true that Ford interacted with others on the street and entered a home before he got into Newman's truck, he did not engage in the drug deal until after he had gotten into the truck. This made it reasonable for the officers to believe that the truck's driver – Newman – was involved in the transaction.

For these reasons, no reasonable jury could find that probable cause was lacking. The defendants are entitled to summary judgment on Newman's false arrest claim.

## 2. Malicious prosecution claim

Newman's second claim is a state law claim for malicious prosecution. Under Illinois law, to succeed on this claim, Newman must prove: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause

8

for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Ritchey v. Maksin*, 71 Ill. 2d 470, 475, 376 N.E.2d 991, 993 (1978). Defendants argue, as they did on Newman's false arrest claim, that probable cause is lacking.

Probable cause for purposes of an Illinois malicious prosecution claim is defined in essentially the same way as it is for Newman's Fourth Amendment false arrest claim. *See, e.g., Fabiano v. City of Palos Hills*, 336 Ill. App. 3d 635, 642, 784 N.E.2d 258, 266 (2002) ("Probable cause is a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged."); *see also, e.g., Harpham v. Whitney*, 77 Ill. 32, 42 (1875) (probable cause defined as "a state of facts . . . as would lead a man of ordinary caution and prudence to believe, or entertain an honest and strong suspicion that the person arrested is guilty."); *Freides v. Sani-Mode Mfg. Co.*, 33 Ill. 2d 291, 295-96, 211 N.E.2d 286, 288-89 (1965).

Ordinarily, a finding that there was probable cause to arrest likewise bars a claim for malicious prosecution. *See Holmes v. Hoffman Estates*, 511 F.3d 673, 681 (7th Cir. 2007) (probable cause to arrest a person on a particular charge bars that person's suit for malicious prosecution on the same charge); *Ross v. Mauro Chevrolet*, 369 Ill. App. 3d 794, 802, 861 N.E.2d 313, 320 (2006) (explaining that probable cause to arrest "proves fatal" to malicious prosecution claim). And the Seventh Circuit has squarely rejected a contention that probable cause should be defined in a different way for malicious prosecution claims than for false arrest claims – the argument that the court rejected being that because the decision to prosecute is made more deliberately, the

9

test for probable cause should be more stringent in that context. *See Johnson v. Saville*, 575 F.3d 656, 662 (7th Cir. 2009).

The test for malicious prosecution, however, is proceeding-specific. The question is whether there was probable cause "for such proceeding" – namely, the proceeding on which the plaintiff claims malicious prosecution. *See Ritchey*, 71 Ill. 2d at 475, 376 N.E.2d at 993 (question is whether there was "probable cause *for such proceeding*") (emphasis added); *see also Johnson*, 575 F.3d at 659 (repeating "such proceeding" language); *Swick v. Liautaud*, 169 Ill. 2d 504, 512, 662 N.E.2d 1238, 1242 (1996) (repeating requirement of an absence of probable cause "for such proceeding"); *Reynolds v. Menard, Inc.*, 365 Ill. App. 3d 812, 819, 850 N.E.2d 831, 837 (2006) (repeating "such proceeding" language).

One can imagine a case in which probable cause to arrest exists, but events occurring or information gathered between the arrest and filing of criminal charges undermine the existence of probable cause to prosecute. *See Guidry v. Boyd*, No. 06 C 1600, 2007 WL 2317174, at *13 (N.D. Ill. July 17, 2007) (considering whether there had been intervening events after arrest that made probable cause dissipate); *Ross*, 369 Ill. App. 3d at 802, 861 N.E.2d at 320 (finding no intervening event between arrest and prosecution negating probable cause). In *Johnson v. Target Stores, Inc.*, the court cited two New York cases to define "intervening events" and explain how probable cause to arrest might vanish between an arrest and the filing of charges. *Johnson v. Target Stores, Inc*, 341 Ill. App. 3d 56, 78-79, 791 N.E.2d 1206, 1224 (2003) (citing *Brown v. New York*, 459 N.Y.S.2d 589, 92 A.D.2d 15 (1983); *Feinberg v. Saks & Co.*, 833 A.D.2d 952, 443 N.Y.S.2d 26 (1981)). One example is a situation in which evidence

exonerating the arrestee came to light after the arrest. *See Brown*, 459 N.Y.S.2d at 592, 92 A.D.2d at 20.

In this case, Newman does not contend that evidence came to light after his arrest that negated probable cause. The Court notes that it does not appear that the police examined Newman's or Ford's telephone records to determine whether he and Ford had communicated during the relevant period. But Newman does not argue in his response to the motion for summary judgment that law enforcement's failure to inquire into potential exculpatory evidence after his arrest undermined probable cause to prosecute him, and in any event, the failure of the police to investigate this angle does not mean that probable cause to prosecute was lacking. *See Ross*, 369 Ill. App. 3d at 800, 861 N.E.2d at 318 (The "police may act on the basis of inculpatory evidence without trying to tote up and weigh all exculpatory evidence.") (quoting *Hernandez v. Sheahan*, 455 F.3d 772, 775 (7th Cir. 2006)).

Newman does contend, however, that Cikulin's allegedly false testimony that Ford said he got the crack from Newman was material and contributed to the decision to charge him. Taking as true Newman's contention that Cikulin testified falsely, that does not negate the existence of probable cause or give Newman a viable malicious prosecution claim. In this sort of situation, a court simply sets aside the allegedly perjured testimony and examines whether the remaining evidence adds up to probable cause. *See Cervantes v. Jones*, 188 F.3d 805, 811 n.7, 814 (7th Cir. 1999) (stating that indictment obtained by allegedly perjured testimony would not be considered, but still finding probable cause to prosecute based on remaining evidence). This is roughly the same sort of analysis used to assess whether a warrant obtained based on material

false statements or omissions is nonetheless valid. *See Franks v. Delaware*, 438 U.S. 154, 156, 171-72 (1978). And the same analysis is used for summary judgment purposes when some of the information relied on for probable cause is disputed: a court looks at the remaining, undisputed information, and if that information is sufficient to establish probable cause, the existence of a factual dispute regarding other information does not prevent entry of summary judgment. *See Johnson*, 575 F.3d at 662; *Logan v. Caterpillar*, 246 F.3d 912, 926 (7th Cir. 2001).

In sum, in the particular circumstances of this case, the existence of probable cause to arrest Newman is not negated by Cikulin's alleged perjury before the grand jury. Defendants are entitled to summary judgment on Newman's claim for malicious prosecution.

### 3. Conspiracy claim

Newman also alleges that the defendant officers engaged in a conspiracy to falsely arrest and charge him with a crime, steal his money, and not report each other. The Seventh Circuit has defined a civil conspiracy as "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties . . . ." *Hampton v. Hanrahan*, 600 F.2d 600, 620-21 (7th Cir. 1979) (internal quotation marks and citation omitted), *rev'd in part on other grounds,* 446 U.S. 754 (1980). To sustain a claim under section 1983 for a conspiracy to violate constitutional rights, the plaintiff must offer facts that "support an agreement between the defendants." *Kunik v. Racine County*, 946 F.2d 1574, 1580 (7th Cir. 1991). There must be a "meeting of the minds," though the agreement need not be overt, and a court can infer a conspiracy

when it is unlikely acts would have been performed by the conspiracy members without an agreement. *Id*. Vague allegations of conspiracy, however, are insufficient to get a plaintiff past a motion for summary judgment. *See Amundsen v. Chicago Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000).

In this case, as in *Amundsen*, Newman has "nothing more than bald assertions" to support his claim of a conspiracy. *Id.* at 717. Newman argues that a jury could infer an agreement to deprive him of his constitutional rights from Ramirez's alleged statement that Newman was "going down" and his claimed threat to take Newman's Tahoe, as well as Cikulin's allegedly false grand jury testimony discussed earlier. But none of this amounts to evidence from which a jury could find not just that those officers violated Newman's rights, but that they entered into an agreement to do so.

For this reason, the defendants are entitled to summary judgment on Newman's conspiracy claim.

### 4. Unlawful seizure of property claim

Newman also claims that Nauden took $750 from him after his arrest. The defendants have withdrawn their motion for summary judgment as to this claim.

## Conclusion

For the reasons stated above, the Court grants defendants' motion for summary judgment [docket no. 31] as to counts 1, 2, and 3 (the false arrest, malicious prosecution, and conspiracy claims) but denies the motion as to counts 4 and 5 (the unlawful seizure claim and the indemnification claim against the City insofar as it involves count 4). The case is set for a status hearing on July 1, 2010 at 9:30 a.m. to discuss the impending trial date and how long the parties now believe the trial will take

13

in light of the Court's ruling on summary judgment.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: June 28, 2010